CAMBRIDGE BIOTECH CORPORATION & another[1] *vs.* PASTEUR
SANOFI DIAGNOSTICS & others.[2]

Middlesex. November 10, 2000. - December 22, 2000.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Conflict of Laws. Contract,* Choice of forum clause, Choice of law clause.
*Practice, Civil,* Choice of forum.

This court concluded that, in a complex business transaction, civil claims
arose under a licensing agreement and not under a bankruptcy judgment
entered two years before the licensing claims arose [128-130]; and the
forum selection clause in the licensing agreement, designating the home
courts of the respective defendants, in this case, France, was not ambigu-
ous, invalid, the product of mistake or misunderstanding, induced by fraud,
or otherwise not the rational agreement of the parties, and was enforceable.
[130-134]     .

CIVIL ACTION commenced in the Superior Court Department on
January 20, 1999.

The case was heard by *Allan van Gestel,* J., on a motion to
dismiss, and entry of a separate and final judgment was ordered
by him.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*William J.T. Brown,* of New York (*Allen C.B. Horsley &
David A. Hoffman* with him) for the plaintiffs.

*Jeffrey D. Sternklar* (*Michael R. Gottfried* with him) for Pas-
teur Sanofi Diagnostics.

GREANEY, J. We transferred this case to this court on our own
motion to decide whether a forum selection clause in a licens-
ing agreement between the plaintiff Cambridge Biotech Corpora-
tion (CBC) and the defendant Pasteur Sanofi Diagnostics (Pas-

[1]Cambridge Affiliate Corporation.

[2]Ronald Zwanziger; Selfcare, Inc.; Cambridge Diagnostics Ireland Ltd.; and
Trinity Biotech, plc. Of the defendants, Pasteur Sanofi Diagnostics is the only
party to this appeal.

teur) should be enforced. The clause required any controversy "exist[ing] or aris[ing]" under the agreement to be brought in the courts of the defending party (in this instance the courts of France where Pasteur is based). A judge in the Superior Court allowed Pasteur's motion to dismiss the claims against it brought by CBC and Cambridge Affiliate Corporation (CAC), on the basis that the forum selection clause should be enforced. The judge also ordered the immediate entry of judgment pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). The plaintiffs appealed from the judgment. We conclude that the clause is enforceable and, as a result, the controversy between the plaintiffs and Pasteur should be decided by the courts in France. After modifying the judgment to incorporate a declaration of rights, we shall order that the judgment be affirmed.

The background necessary to decide the appeal is as follows.[3] CBC is a technology licensing company holding patent licenses for diagnostic tests that detect the presence of the human immunodeficiency virus (HIV) associated with Acquired Immune Deficiency Syndrome (AIDS). Pasteur is a French company that is the exclusive licensee of diagnostic patents developed by Institut Pasteur, a nonprofit French foundation engaged in research and development to combat AIDS.

On October 25, 1989, CBC and Pasteur (then Diagnostics Pasteur) entered into two cross-licensing agreements, one royalty free and the other royalty bearing, to make available patented technology that the other wanted, including technology useful in developing diagnostic products to detect the presence of HIV. Both cross-licensing agreements prohibited sublicensing of the licensed patents, but they specifically permitted the benefits of the agreement to accrue to any "Affiliated Company" of CBC or Pasteur.[4] Both cross-licensing agreements also specifically provided that the rights or benefits of the agreements were not assignable by any party, in whole or in part,

---

[3]Because this is an appeal from a motion to dismiss, we accept as true all of the plaintiffs' allegations in their complaint and all reasonable inferences therefrom. *Spinner* v. *Nutt*, 417 Mass. 549, 550 (1994). Our decision, however, does not turn on any particular characterization of the facts most favorable to the plaintiffs.

[4]An "Affiliated Company" was defined in the cross-licensing agreements as "an organization which controls or is controlled by a party or an organization which is under common control with a party hereto and/or an organization qualifying as above (control shall mean direct or indirect legal or beneficial ownership of [fifty-one per cent] or more of the voting stock)."

without the prior written consent of the other. Both also gave each party the right to terminate the agreements "in the event of a substantial breach of any of the articles of this Agreement" by giving sixty days' written notice, if the breach was not rectified within those sixty days. In addition, each of the cross-licensing agreements contained the following provision: "Should any controversy exist or arise under the present Agreement, it is herewith agreed that the parties shall bring it before the courts in the country of the respective defendant." Massachusetts law, however, would govern the interpretation of the agreements. It is the royalty-bearing cross-licensing agreement (licensing agreement), under which Pasteur cross licensed its HIV-2 technology to CBC in exchange for other viral technology of CBC, that is the subject matter of this dispute.

In 1994, CBC filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts. While under Chapter 11 reorganization, CBC continued to manage and operate its business as a debtor in possession. At the time of the reorganization, CBC operated a wholly owned subsidiary in Galway, Ireland, then known as Cambridge Biotech Limited, but subsequently renamed Cambridge Diagnostics Ireland Ltd. (CDIL). CDIL was primarily engaged in the manufacture and sale of HIV diagnostic products using patented technology owned by or licensed to CBC, including patented technology licensed to CBC by Pasteur. Because CDIL was an affiliated company of CBC, it had access to this technology under the cross-licensing agreements.

CDIL was a cash drain on CBC, and steps were taken in the bankruptcy proceeding to sell it to a third party, Selfcare, Inc. (Selfcare). At least one problem needed to be overcome for the sale of CDIL to Selfcare to succeed: in the event that Selfcare acquired CDIL, CDIL would lose its affiliated company status and, consequently, the rights to certain of Pasteur's licensed patents. Without those patent rights, CDIL would be unable to manufacture HIV diagnostic products, and would have little value to Selfcare.

CBC sought to resolve this dilemma through the creation of a pass-through entity, the plaintiff Cambridge Affiliate Corporation (CAC). According to the plan formulated, CAC would be fifty-one per cent owned by CBC (and so would be an affiliated company under the cross-licensing agreements) and forty-nine

per cent owned by Selfcare. CBC would then grant CAC the license rights granted by Pasteur under the cross-licensing agreements, and CAC, in turn, would execute a manufacturing and sales agreement with CDIL, whereby CDIL could continue to manufacture and sell the same HIV diagnostic products it had previously manufactured as a CBC subsidiary. Because this plan was formally not a licensing agreement, it was arguably not a prohibited sublicensing under the cross-licensing agreements. Pragmatically, however, it resulted in CDIL, although owned and controlled by Selfcare, being able to use the same patented technology it had used before the Selfcare acquisition.

In an order dated November 18, 1994, the Bankruptcy Court allowed CBC's motion to approve the sale of CDIL to Selfcare. The order authorized CBC to transfer certain patented technology under the terms of the plan, but included the following provisions:

> "PROVIDED, that with respect to rights to intellectual property licensed to [CBC] by [Pasteur] under [the cross-licensing agreements], this Order does not authorize the direct or indirect transfer, assignment or sublicensing of such rights to [CDIL] or to Selfcare without the prior consent of [Pasteur], as provided in the [cross-licensing agreements], but does authorize [CBC] as provided in the [cross-licensing agreements] to extend to an affiliated company (51% of whose voting stock is legally or beneficially owned, directly or indirectly, by [CBC]) the benefits of the [cross-licensing agreements] so that [CBC] shall remain responsible with regard to all obligations placed upon [CBC] by the basis of the [cross-licensing agreements]; and

> "PROVIDED, further, that nothing in this Order shall affect any disputes between [CBC] and [Pasteur] concerning (i) the amount of any royalties payable by either party to the other under the [cross-licensing agreements] or (ii) [CBC]'s right to manufacture, use and/or sell Licensed Products (as defined in the [cross-licensing agreements]) in the [exclusive territory defined by the cross-licensing agreements]."

Pasteur consented to this order.

Subsequently, on November 23, 1994, CBC, CDIL, and Selfcare executed an agreement providing for the sale of CDIL stock to Selfcare, and, on November 30, 1994, CBC and Selfcare executed a shareholders' agreement dealing with the governance of CAC. Under the provisions of this agreement, CBC (although the holder of a majority stock interest in CAC), granted Selfcare day-to-day management control over the company, including, effectively, the power to veto any act by CAC that Selfcare did not approve. CBC's voting control allowed CAC to permit CDIL to use Pasteur patented technology without violating the prohibition against sublicensing in the licensing agreements. Selfcare's governing control gave Selfcare the assurance that CDIL's manufacturing and sales agreement with CAC would not be subject to change by CBC without Selfcare's approval. (We shall hereafter refer to the above, and all related agreements, as the Selfcare arrangements.)

On May 9, 1996, in preparation for CBC's emergence from Chapter 11 reorganization, the Bankruptcy Court issued a so-called bar order, setting July 9, 1996, as the date beyond which all claims arising out of CBC's executory contracts or unexpired leases would forever be barred. On July 18, 1996, the Bankruptcy Court judge entered an order confirming CBC's reorganization plan, ruling that there were no breaches in any of the contracts assumed by CBC, or that, if there were any breaches, they were deemed cured; and approving CBC's assumption of the Selfcare arrangements and the cross-licensing agreements.[5] Nothing in the confirmation order modified the terms of the earlier court order approving the sale of CDIL, or modified the antiassignment provisions in the cross-licensing agreements.

On September 30, 1998, Selfcare sold virtually all of CDIL's

[5]As part of the reorganization plan, all of CBC's issued and outstanding stock was sold to bioMerieux Vitek, Inc. (bioMerieux), a large French biotechnology corporation and a major competitor of Pasteur. As a result of this sale, bioMerieux became an affiliated company under the cross-licensing agreements, and so acquired rights to Pasteur's patented technology. This acquisition was unsuccessfully challenged by Pasteur and Institut Pasteur, which claimed that it amounted to a prohibited de facto assignment of its patent licenses. See *Institut Pasteur* v. *Cambridge Biotech Corp.*, 104 F.3d 489, 492-494 (1st Cir.), cert. denied, 521 U.S. 1120 (1997) (sale of CBC stock to bioMerieux was not prohibited assignment of licenses, but assumption of licenses by reorganized debtor under new ownership as permitted under Bankruptcy Code).

assets to Trinity Biotech Manufacturing Limited, a wholly owned subsidiary of Trinity Biotech, plc. (Trinity). As has been described, CDIL's right to use Pasteur's patented technology was enabled only by the manufacturing and sales agreement that CDIL had with CAC, and could not be assigned without the agreement of CAC. The chief executive officer of Selfcare, Ronald Zwanziger, was also the chief executive officer of CAC. Acting allegedly on his own, apparently without the knowledge of others at CAC and without consulting CBC, Zwanziger executed a manufacturing and sales agreement between CAC and Trinity, that was allegedly identical to the one that CAC had executed with CDIL. This arrangement purportedly permitted Trinity to use Pasteur patented technology in its manufacturing operations, as CDIL had done under the Selfcare agreements.

On November 20, 1998, CBC's president, Phillippe Sans, informed Zwanziger that "[i]f implemented and maintained in effect the CDIL/CAC/Trinity arrangements could be contended to constitute a sublicense of the technology concerned in the [licensing agreements]." CBC then sought to terminate the extension of license rights to CAC, unless the situation was promptly cured.

On November 26, 1998, Pasteur informed CBC that it was terminating "the part of this [licensing] agreement referring to HIV2 patents" as a result of the unauthorized assignment of its patented technology to Trinity. Termination was to become effective within sixty days, unless the alleged breaches of the licensing agreement were remedied.

CBC's response was prompt. At a special meeting of CAC's board on January 15, 1999, the CBC designates on the board voted to undo the Trinity asset purchase and seize total control of CAC. By a written consent of CBC, the fifty-one per cent shareholder, it was voted that CAC should be dissolved.

On January 20, 1999, the plaintiffs filed an eight-count complaint in the Superior Court against Zwanziger, Selfcare, CDIL, Trinity, and Pasteur. Three of the eight counts named Pasteur: one sought declaratory and injunctive relief regarding Pasteur's rights to terminate the licenses; another charged Pasteur with tortious interference with present and future economic relations by the termination of the Pasteur licenses; and a third count claimed violations by Pasteur of G. L. c. 93A. At the same time, the plaintiffs filed a motion to preliminarily enjoin Zwanziger, Selfcare, CDIL, and Trinity from acting pursuant to

CAC's manufacturing and sales agreement with Trinity and also preliminarily to enjoin Pasteur from terminating the licensing agreement. A judge of the Superior Court denied their motion for a preliminary injunction.

Pasteur subsequently filed a motion to dismiss all of the plaintiffs' claims against it on grounds that the forum selection clause mandated that these claims must be brought in the courts of France. Another judge in the Superior Court, undoubtedly aided by the analysis of the judge who had decided the preliminary injunction application, concluded that the clause was not ambiguous, invalid, the product of mistake or misunderstanding, induced by fraud, or otherwise not the rational agreement of CBC and Pasteur, both sophisticated and knowledgeable entities. The judge then considered affidavits on French law submitted by the parties and found the position of the two submitted by Pasteur's experts to be more compelling in their analysis than the affidavit submitted by the plaintiffs' expert. The judge rejected the plaintiffs' claims that the forum selection clause did not apply or was unenforceable because it was not "fair and reasonable," see *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575 (1995), and he determined that the plaintiffs' claims against Pasteur should properly be brought in the courts of France.

1. Despite the convoluted business transactions described, the case turns on a relatively simple issue: (a) whether, as the plaintiffs contend, the proceedings and orders of the Bankruptcy Court prohibit Pasteur from using the Selfcare arrangements as grounds for terminating the licensing agreement, and Pasteur's violation of these orders requires, as matter of law, that this case be litigated in Massachusetts; or (b) whether, as Pasteur contends, the controversy is one that exists or arises under the licensing agreement and that is not controlled by the proceedings or orders in the Bankruptcy Court so that, there being no other lawful reason to deny enforcement of the forum selection clause, the controversy should be resolved by the courts of France.

The plaintiffs' assertion that the forum selection clause does not apply to their claims because they arise from the orders of the Bankruptcy Court, rather than from the licensing agreement, is somewhat remarkable. Although one of the allegations in the plaintiffs' complaint is that Pasteur's action terminating the licensing agreement violates the orders of the Bankruptcy Court,

the thrust of the plaintiffs' claims against Pasteur is that its termination was wrongful because the manufacturing and sales agreements between CAC and Trinity were null and void, and, as a result, could not constitute prohibited sublicenses. Specifically, the plaintiffs' prayer for relief requests a straightforward declaration that: "the [licensing agreements] between [Pasteur] and [CBC] are in full force and effect, have not been breached by the acts of any of the parties of this action including but not limited to by the purported entering into of manufacturing and sales agreements between CAC and Trinity, and enjoining [Pasteur] from attempting or purporting to terminate its [licensing agreements] with [CBC] because of the purported agreements between CAC and Trinity." This request is silent as to a bar by reason of any bankruptcy orders. In light of this language, it is somewhat difficult to understand the plaintiffs' present argument that their claims are solely an attempt to enforce the orders of the Bankruptcy Court. See *Terra Int'l, Inc.* v. *Mississippi Chem. Corp.*, 119 F.3d 688, 694 (8th Cir.), cert. denied, 522 U.S. 1029 (1997).

Nonetheless, in light of the generosity given to a complaint faced with a motion under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), we consider, and reject, the plaintiffs' argument that the orders of the Bankruptcy Court operate to bar Pasteur from terminating CBC's licensing rights under principles of res judicata. The basis for Pasteur's termination was that the Trinity transaction was an impermissible assignment or sublicensing under the licensing agreement. This transaction was not referenced by the Bankruptcy Court in its approval of the Selfcare arrangements or the plan of reorganization, nor could it have been, because it occurred over two years after CBC emerged from bankruptcy. We need not decide the impact of the November 18, 1994, order of the Bankruptcy Court dealing with the Selfcare arrangements on the post-bankruptcy transfer of rights by CAC to Trinity. This issue is only one (out of many) that a court faced with deciding the dispute might consider in assessing the validity of Pasteur's termination. There is nothing in CBC's reorganization plan, or in the Bankruptcy Court's confirmation order, that would alter Pasteur's rights under the licensing agreement or would render

the forum selection clause inoperable.[6] See *United States* v. *Carolina Parachute Corp.*, 907 F.2d 1469, 1473-1474 (4th Cir. 1990). While the bankruptcy orders may be relevant, they do not conclusively decide the controversy between the plaintiffs and Pasteur. We conclude that the plaintiffs' claims existed and arose under the licensing agreement rather than under the bankruptcy orders, and, in the absence of any of the circumstances set forth in *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, *supra*, that may be relevant, a matter that will be discussed next, the claims must be litigated in the courts of France.[7]

In the *Jacobson* decision, we accepted the modern view that a forum selection clause should be enforced so long as it is fair and reasonable to do so. *Id.* at 574-575. See Restatement (Second) of Conflict of Laws § 80 (1971 & rev. 1989) ("The parties' agreement as to the place of the action will be given effect unless it is unfair or unreasonable").[8] The United States Supreme Court has stated that, for a court to conclude that enforcement of a forum selection clause in a freely negotiated international commercial transaction is unfair or unreasonable, the party who seeks to escape the consequences of the clause must show that "trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *The Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972). See Restatement (Third) of the Foreign Relations Law of the United States § 421 comment h, at 308 (1987) (action brought contrary to selected forum will

[6]The bar order merely set a deadline by which claims against CBC must be filed, and did not protect CBC from litigation over postbankruptcy claims. Pasteur's failure to object to the Selfcare arrangements at the time of CBC's reorganization in no way estops Pasteur from asserting that subsequent actions of CBC violated the licensing agreement.

[7]The plaintiffs' remaining claims against Pasteur, for tortious interference with economic relations and for G. L. c. 93A violations, both characterize Pasteur's termination as an improper attempt to drive CBC and its affiliates from the diagnostic product market. Because these tort claims involve the same operative facts, they also should be heard in the forum selected by the parties. See *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 579 (1995) ("A plaintiff should not be allowed to vitiate the effect of a forum selection clause simply by alleging peripheral claims that fall outside its apparent scope").

[8]The plaintiffs do not allege that the forum selection clause in issue was obtained by fraud, duress, the abuse of economic power, or any other unconscionable means. See *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, *supra* at 575 n.5; Restatement (Second) of Conflict of Laws § 80 comment c (1971 & rev. 1989).

generally be dismissed "unless the plaintiff shows that the chosen forum is no longer available or could not be expected to grant him a fair hearing").

The plaintiffs contend that referring the dispute to the French courts would be so unfair and unreasonable as to constitute a "denial of justice." Their argument rests essentially on the premise that, because French courts are unfamiliar with the principles of United States bankruptcy procedure, they could not properly interpret the bankruptcy orders. So, the plaintiffs reason, they would be put at serious risk of losing the protection CBC relied on as part of its reorganization in Bankruptcy Court. This premise is unfounded.[9]

There is no inherent disadvantage accruing to the plaintiffs by virtue of having their claims decided in the courts of France. Affidavits on French law submitted by the parties are in agreement[10] that the courts of France would be obligated to accept jurisdiction over the plaintiffs' claims under France's ratification of the Brussels Convention,[11] and that the courts of France would also give effect to the parties' choice of Massachusetts law as the governing standard. The plaintiffs' concerns focus primarily on the ability of the French courts properly to interpret the orders of a United States Bankruptcy Court. On this point, the opinions differ.

The plaintiffs' expert, Horatia Muir Watt, a professor of law at the University of Paris, raises the concern that a French court might have difficulty determining the relevancy of the orders of the Bankruptcy Court authorizing the Selfcare arrangements, specifically, whether the orders preclude Pasteur from contending that the subsequent Trinity transactions are unauthorized

[9]We reject here the plaintiffs' assertion that enforcement of the forum selection clause is not fair or reasonable because French courts lack jurisdiction over other parties claiming rights under bankruptcy orders entered in the United States.

[10]It is appropriate to file affidavits in a case such as this even though the motion before the court is a motion to dismiss. The judge deciding the motion needs to be informed by experts in the law of the foreign jurisdiction of their views of the capability of the foreign courts to decide the dispute, so that the judge may assess whether dismissal of the case would result in a just and reasonable resolution of the dispute in the foreign jurisdiction.

[11]Article 17 of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (Sept. 1968) provides that the courts of a "contracting State" have exclusive jurisdiction when they are designated by a forum selection clause and one of the parties is domiciled there.

under the licensing agreement. According to Professor Muir Watt, because the bankruptcy orders have not been granted an "exequatur,"[12] the orders would have no legal effect, and so there would be no obstacle to the courts of France deciding the issue anew, with potentially unfair consequences to the plaintiffs. Even if the bankruptcy orders do not have res judicata effect, Professor Muir Watt opines that a judge in a court in France might have serious difficulty interpreting the appropriate relevance of the bankruptcy orders.

These concerns are answered, more persuasively in our view, by the expert affidavits of Henry Lesguillons, a professor of international law at the University of Paris, and Andreas F. Lowenfeld, a professor of international law at New York University School of Law. Professor Lesguillons states that, because the bankruptcy orders do not directly address the dispute between CBC and Pasteur, exequatur would not be necessary under French law. Both experts further conclude that the French courts would apply and interpret the bankruptcy orders in a reasonable and just way. There is no basis in the record to conclude that the courts of France are incapable of interpreting the appropriate effect to give to orders of a United States Bankruptcy Court, that, in any event, are not at the center of the controversy between the plaintiffs and Pasteur.[13]

The affidavit of Professor Lesguillons raises an additional,

---

[12]"Exequatur" ("let it be executed") is the authorization to execute a judgment from another jurisdiction. See *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co.* v. *Navimpex Centrala Navala*, 29 F.3d 79, 82 (2d Cir. 1994). As explained in the affidavit of Professor Muir Watt, if an action to obtain exequatur were to be introduced in a French court, a judge may decide to stay the proceedings, pending the outcome of the exequatur action. The affidavit of Professor Lesguillons sets forth the following conditions for a grant of exequatur: (1) the jurisdiction of the foreign court which rendered the decision; (2) the regularity of the procedure before that court; (3) the application of the applicable law according to French conflict rules; (4) the conformity to international mandatory rules; and (5) the absence of fraud. For this he cites a French decision, Cass. civ. 1re, 7 Janvier 1964, RCDIP 1964, 344.

[13]The plaintiffs also claim that they could not fairly be compensated under French law for Pasteur's wrongful termination of CBC's HIV-2 license rights, because the courts of France lack the power to order specific performance in a contract case such as this. On this point of French law, the affidavits of Professor Muir Watt and Professor Lesguillons disagree. A forum selection clause in an international contract, however, is not rendered unenforceable because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States. See *Lipcon* v. *Underwriters at Lloyd's, London*, 148 F.3d 1285, 1297 (11th Cir. 1998), cert.

and important, concern. He makes the point that, should we decide to retain jurisdiction of the Massachusetts courts over the plaintiffs' claims, a French court might refuse to grant exequatur to a Massachusetts order or judgment.[14] On this issue, the law in France apparently is entirely consistent with § 4 of the Uniform Foreign Money-Judgments Recognition Act, as adopted in Massachusetts. 13 U.L.A. 268 (Master ed. 1986). See G. L. c. 235, § 23A (foreign judgment shall not be recognized if "the proceedings in the foreign court were contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court"). Thus, it is not beyond likelihood that the plaintiffs, if successful, might be armed with a Massachusetts judgment that would be unenforceable against Pasteur in France.

Here, two sophisticated parties voluntarily agreed in advance that any action arising under the licensing agreement would be brought in the home courts of the respective defendant. Massachusetts law requires us to respect their wishes, and international comity requires us to respect the ability of the French courts fairly and competently to settle the parties' dispute. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629 (1985). The plaintiffs have not met their substantial burden of showing that honoring the forum selection clause would deprive them of any meaningful day in court. See *The Bremen* v. *Zapata Off-Shore Co.*, *supra* at 19.[15] It is just and reasonable to require the plaintiffs to bring

denied, 525 U.S. 1093 (1999); *Riley* v. *Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir.), cert. denied, 506 U.S. 1021 (1992) ("The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement [of a forum selection clause], provided that the law of the chosen forum is not inherently unfair").

[14]For this Professor Lesguillons cites two French decisions, C.A. Paris, 14 Novembre 1975, RCDIP 1977, 526, and Cass. civ. 1re, 5 Mars 1969, RCDIP 1970, 546 (foreign judgment rendered "despite a forum selection clause cannot receive exequatur in France since the court had no jurisdiction").

[15]Whatever inconvenience the plaintiffs might suffer by being required to bring their suit in the courts of France was clearly foreseeable at the time the contract was made. See *The Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 17-18 (1972). We reject the plaintiffs' assertion that enforcement of the forum selection clause would violate their expectations either in 1989, because the agreement was made before our decision in *Jacobson* v. *Mailboxes U.S.A., Inc.*, *supra*, made forum selection clauses generally enforceable in Massachusetts, or when it emerged from bankruptcy in 1996, because CBC did

their claims against Pasteur in the courts of France.[16]

2. The judgment is modified to enter a declaration pursuant to G. L. c. 231A that the forum selection clause in the licensing agreement between CBC and Pasteur is enforceable and requires that the dispute be decided by the courts in France. With this modification, the judgment dismissing the plaintiffs' claims against Pasteur is affirmed.

*So ordered.*

---

not imagine then that the forum selection clause would be enforced for a claim involving orders of the Bankruptcy Court.

[16]The plaintiffs make a brief and off-hand argument that they should have been permitted to amend their complaint to state claims that might withstand dismissal. The plaintiffs made no motion for leave to amend the complaint after Pasteur's motion to dismiss was granted, and they have not informed us of the substance of any proposed amendment that might so undermine the forum selection clause as to render the provision nugatory.