van Gestel, J.
This matter is before the Court on cross-motions for summary judgment pursuant to Mass.R.Civ.P. Rule 56. Each party asserts that there are no material facts in dispute, and yet each argues that it is entitled, as a matter of law, to judgment in its favor. After stating the apparently undisputed facts, the Court will apply the law and order judgment appropriately.
BACKGROUND
On January 3, 1997, a cargo of sugar said to belong to Longen, S.A. (“Longen”), set sail from Santos, Brazil, aboard the M/V Villa, on an epic voyage to Israel and beyond, the likes of which may not have been seen since the days of Demosthenes.[1] Four weeks later, the Villa collided with another vessel near Malta in the Mediterranean Sea. Four months later, after repairs in Malta, a journey to Gaza, then moving up the coast to Beirut, the Villa’s owners seized control of the ship and her cargo, sailed for their home port of Mersin, Turkey, and sold what sugar remained — all allegedly counter to Longen’s instructions.
What is now at issue is whether Longen’s “all risks” marine cargo insurance from the defendant, Lexington Insurance Company (“Lexington”), provides solace and economic indemnification against such uncertainties. Lexington, asserting various defenses to Longen’s claim under the policy, thinks not.
Longen is a Swiss corporation and is in the commercial trading business.
*105 Lexington is an insurance carrier, licensed to conduct business in the Commonwealth of Massachusetts, in Boston.
Lexington and a Belgian entity known as Group B.U.O. (“BUO”) are parties to a certain “Agency Agreement.” The Agency Agreement recites that BUO “shall act forthwith as Agent for [Lexington] in world-wide Marine and Inland Marine business.” This is said by the general manager of Lexington’s London (England) branch to mean that BUO would be acting on Lexington’s behalf “in underwriting — in procuring and underwriting, managing this business.” BUO’s authority was characterized as “fairly broad.” Lexington itself does not seem to have any significant expertise in marine cargo insurance, and therefore relies upon BUO.
This saga began in 1996, when Longen learned that a Palestinian-owned company called Grepalco was interested in purchasing a cargo of sugar for delivery to the Gaza Strip in Israel. Farbod Taha (“Taha”), a commercial manager for Longen engaged in commodities trading, handled negotiations with Grepalco for the purchase and sale of the sugar. Sava Dimas (“Dimas”) represented Grepalco in the negotiations. The contract was entered into in October of 1996. It provided for the shipment to Ashdod, Israel, for transit to Gaza, of “12,500 metric tons +/- 5% white refined cane sugar, packed preslung in 50 kg new polylined jute bags.” Payment by Grepalco was to be by letter of credit, and “delivery must conform to the letter of credit.” While negotiating the sale with Grepalco, Taha contacted Nick Topp (“Topp”) at Steel Burill Jones (“SBJ”), a London insurance brokerage, to obtain a quotation for coverage of the sugar shipment. After speaking with Taha, Topp telephoned Robert Denayer (“Denayer”) at BUO in Brussels, Belgium, who expressed interest.
On September 12, 1996, Denayer telephoned Topp with a prepared quotation. Included in the quotation, among financial terms and other things, was the “Institute Cargo Clauses (A).” These clauses are standard terms in the London marine insurance cargo market. The “(A) Clauses,” as they are sometimes known, provide in Clause 19: “This insurance is subject to English Law and practice.”
Topp’s notes reflecting Denayer’s quotation included the following: “Quantity and Quality of the Sugar by Superintendents to be approved by u/wr [underwriter].” Topp explained that that note signified that “[Denayer] would have requested or would be requesting if he was to take the insurance on [that] a survey be done of the cargo.” Denayer’s notes refer to a warranty regarding “quantity/state of sugar ascertained by superintendents to be approved.” Denayer explained these notes as follows: “I put here ‘warranted’ . . . that the quantity and state of the sugar — that’s what I mean by quality — had to be ascertained by the surveyor — ’superintendent’ I put here — and that superintendent had to be agreed, approved by us.”
By contract dated November 5, 1996, Longen agreed to purchase sugar from Interpart, a Portuguese Company, through Interpart’s Brazilian exporting company SIMAB S.A. SIMAB was the agent and representative of Interpart for all sugar transactions in Brazil. Interpart, in turn, acquired the sugar from Cpersucar, a Brazilian cooperative of sugar mills.
The sale contract between Longen and Grepalco required that the quantity and quality survey be performed “at the time of loading" in accordance with the Refined Sugar Association Rules by either SGS, Lloyds, or Bureau Veritas, three different worldwide cargo surveying companies. The supply contract between Longen and Interpart also required that a quantity and quality inspection be performed, specifying Bureau Veritas as the surveyor.
During the subsequent cargo loading, which took most of December 1996 and the first few days of January 1997, Longen received various drafts of a Bureau Veritas certificate and requested the addition or deletion of details so that it would conform to the requirements of the contract for sale with Grepalco and the letter of credit. SIMAB had coordinated, with Bureau Veritas for the administration of the survey.
In the drafts issued in mid-January 1997, after the Villa had sailed, as well as the final draft Certificate No. 156626 which was provided to Taha on January 17, 1997, the “Results of Analysis” column had been completed. The final draft of the Bureau Veritas Certificate was dated December 14, 1996, allegedly to conform with the letter of credit.
It was Longen that nominated the Villa to carry the sugar to Israel. The Villa was owned and operated by a Turkish entity called VILLA Denizculik Ve Ticaret. The charter party for carriage of the sugar contained a provision whereby the Villa’s owners agreed not to bring “any action or other legal proceeding whether by way of obtaining security or otherwise against [Longen] ... or any assets belonging to [Longen] in respect of any dispute or any claim for payment until such dispute or claim for payment shall have been first heard and determined by arbitrators ...”
Following the execution of the sugar supply contract, and while concluding the charter party with the Villa owners, Taha again turned his attention toward the insurance coverage. Taha and Topp spoke on November 11, 12 and 13, 1996, about obtaining the vessel and confirming that the insurance covered from “warehouse Santos to final warehouse Ashdod.” Topp passed this information on to Denayer by facsimile on November 15, 1996. Denayer responded: “Please confirm our previous phone conversations regarding above: we could write this at 0.585% with a deductible XS of 050% on the whole — brokerage 20%. Warranties as agreed.” Topp confirmed this rate to Longen later *106 that same day and, after setting forth the rate, noted “(a]ll other terms, clauses and conditions remain as per our facsimile dated 13th September 1996.”
On November 15, 1996, Denayer faxed Topp, requesting that he “please urgently let [BUO] know the name of the vessel and the date loading operations will start in order to advise [their] surveyors.” Denayer also provided Topp with contact information for Inspect Santos Consultoria e Peritagens Ltda. (“Inspect Santos”), the surveyor that, according to the facsimile, BUO would approve. Taha faxed Topp on November 18, 1996, providing the name of the nominated vessel and the SIMAB contact person, Lennie Biggs. Denayer, on that same day, faxed Inspect Santos concerning the “consignment of refined sugar” and referred to “L. BIGGS of a company named SIMAB” as the contact person.
Denayer faxed Topp again on November 19, 1996, attaching a facsimile BUO had received from Inspect Santos the previous day and which sought, among other things, the phone and facimile numbers for Lennie Biggs at SIMAB. In his facsimile to Topp, Denayer queried, “[c]ould you please make sure [Inspect Santos] receive[s] this information direct from the assured or forward it to us.”
Topp asked Taha to provide contact information to Inspect Santos and to confirm with Inspect Santos that Longen would be paying the survey fees “so they have time to make arrangements to survey cargo.” Longen prepared a facsimile for Inspect Santos containing the contact information for SIMAB and Longen’s local Santos agent, Wilson & Sons, as well as a request for Inspect Santos’s “fee and expense details” on that same day. By mistake, however, the facsimile to Inspect Santos was sent to Longen’s agent, Wilson & Sons, and not to Inspect Santos.
The Villa was “load ready” in Santos on November 25, 1996, and loading commenced on December 6, 1996. The loading, however, was plagued with long delays, apparently beyond the control of Longen. Loading was completed on January 3, 1997, which was past the load date in the Grepalco contract. Bureau Veritas, not Inspect Santos, was present throughout the loading and at the closing of the. hatches. Its survey certificate, however, was dated December 14, 1996, rather than January 3, 1997, in order — Longen says — to comply with the letter of credit terms in the Grepalco/Longen contract.
In the November 19, 1996, facsimile from Topp at SBJ to BUO confirming having obtained a firm order from Longen, there was reference to “FORM Mar 91 (Slip Policy).” This same reference appeared on the signed facsimile from BUO to SBJ of the same date (the “slip”), and in the letter from SBJ to BUO dated January 27, 1997, wherein Topp asked Denayer to stamp and return the slip. Denayer declined to do so. Longen was not directly a party to any of this correspondence.
Because of its importance to this case, the entire “firm order” sent by Topp to Denayer is set forth here. It reads:
Further to your fax dated 15th November 1996, we are pleased to confirm firm order on the following basis
TYPE: Marine Cargo Insurance
FORM: Mar 91 (Slip Policy)
ASSURED: Longen S.A. and/or associated and/or subsidiary companies.
CONVEYANCE: M/V “Villa” and/or truck and/or other conveyances.
VOYAGE: From warehouse of loading at port Santos, Brazil to warehouse of unloading port Ashdod, Israel.
INTEREST: 13,125 mt of white refined sugar in 50 kg new polylined jute bags and preslang BASIS OF VALUATION: C.I.F. + 25%
SUM INSURED: US $6,332,812.50 anyone conveyance and/or location.
CONDITIONS: Institute Cargo Clauses (A).
Institute War Clauses (Cargo).
Institute Strikes Clauses (Cargo).
Institute Classification Clause (13.4.96) with London scale over-age additional premiums.
Institute Radioactive Contamination Exclusion Clause.
WARRANTED quantity and quality survey to be undertaken by superintendents approved by underwriters, at Assured’s expense.
SUBJECT to an excess of 0.50% on whole shipment value.
RATE: 0.585% + 0.185% (over-age additional premium) + 0.0275% (scale war, strikes, riots and civil commotions rate).
BROKERAGE: 20%
“Mar 91" functions as shorthand for insurance brokers and underwriters and indicates that the parties are going to use the information on the form in their insurance contract, but are not going to go to the trouble of spelling out all of the details in that form. The particular language in Mar 91, relied upon by Lexington here, reads: ’’This insurance shall be subject to the exclusive jurisdiction of the English Courts, except as may be expressly provided herein to the contrary."
There is no evidence that an actual Mar 91 form was ever circulated in this case or that Taha or any other Longen representative was ever provided a copy thereof. Its only reference appears in the documents referred to above.
This is not the first lawsuit on the present insurance dispute. The first suit was actually brought by Lexington, not in any English Court but in Geneva, Switzerland.
*107 At 1:00 p.m. on January 27, 1997, the Villa collided with the M/V Ginga Eagle off the coast of Malta. With a hole in her side, the Villa’s number 1 hold filled with sea water and that hold lost much of its cargo. The vessel was instructed to proceed to Valetta, Malta, in an attempt to save the rest of the cargo and the ship itself.
Longen notified Lexington on January 28, 1997, and requested that Lexington “arrange for a surveyor to attend the vessel to conduct a survey of the damage to the cargo.” Longen also reported to Grepalco that “the M/V ‘VILLA’ ha[d] been involved in a collision with the M/V ‘Ginga Eagle’ off Malta,” and that “(t]he vessel [was] proceeding to Valetta.” Grepalco was advised to “make [their] own inquiries and instruct [their] own surveyors to protect [their] interest in the cargo.”
Numerous surveyors, representing a number of interests, descended on Valetta to examine the Villa and its cargo. Early reports regarding the cargo suggested that the sugar in hold 1, “except a few bags stacked on the upper tier, were submerged.” The cargo in holds 2, 3 and 4, however, was said to be “sound.”
Although a Palestinian representative was among those present at Malta, Grepalco and the Palestinian Ministry of Finance eventually cancelled their contract with Longen.
While the Villa was anchored in or off Malta, Longen sought alternative purchasers. From at least as early as March 12, 1997, the Lebanese Organization for International Commerce (“LORICO”) was a strong contender for purchasing the cargo. This potential sale required changes in the insurance coverage, and Longen had essentially no leverage with BUO. Thus, Longen accepted Endorsement No. 1, covering the extended voyage to Beirut and Abukir for deliveiy of the cargo to LORICO at a lesser insured value of $3,628,225 plus 10%.
Shortly after obtaining Endorsement No. 1, Longen was contacted by LORICO, the latter claiming that it had heard that part of the cargo in holds 2, 3 and 4 was “caked.” As a result, LORICO demanded all survey reports and other relevant information concerning the condition of the cargo. Thereafter, with the Villa now in Beirut, LORICO cancelled the contract.
On May 27, 1997, allegedly because of a dispute over the payment of charter hire between the Villa’s owners and Longen, the Villa sailed from Beirut, headed for Mersin, Turkey. When she arrived, the remaining cargo was discharged and sold. Longen attempted to stop these actions by seeking relief in the Turkish courts. It actually obtained an order from the court in Mersin, on June 13, 1997, to temporarily arrest the Villa. Somehow, however, the Villa completed its discharge of the cargo on June 18, 1997, and sailed away on June 19, 1997.
The sugar discharged in Mersin was sold over the course of July and August 1997. Longen, despite efforts in the Turkish courts, was unable to stop these sales.
As noted above, on July 13, 1997, Lexington initiated a lawsuit against Longen in Geneva. In a “Demande” made on Lexington’s behalf, it was stated: “Whilst our clients are content that we should continue our dialogue with you, they felt it was necessary to ground jurisdiction should it be the case that matters at issue between our clients need to be formally rather than informally resolved.”
On August 5, 1997, Longen formally submitted its full claim of $9,327,356.25 under the insurance policy to Lexington. Thereafter, on October 6, 1997, Longen brought this suit.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Both the plaintiff and the defendant here argue that there are no material facts in dispute, and each claims that the Court can, and should, rule in its favor based solely upon an interpretation of the contract language and the surrounding background events.
Interpretation of an unambiguous agreement is an issue of law for the Court. Lumbermans Mut. Cas. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation, at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instru *108 ment in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In the London insurance market the documents that conclude the contract of insurance are the firm order and its acceptance that passed between Topp and Denayer in the exchange of facsimiles on November 19, 1996, quoted above on pp. 6-7.
In construing the insurance contract here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr v. Fordham, 420 Mass. 178, 190 (1995): Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981). The Court must accept what the contracting parties agreed to and not apply its own gloss to the situation.
Lexington and Longen entered into an insurance contract that incorporated Mar 91, a forum selection clause. The key language of Mar 91 for these purposes reads: “This insurance shall be subject to the exclusive jurisdiction of the English Courts, except as may be expressly provided herein to the contrary.”
Massachusetts accepts the modern view that forum selection clauses are to be enforced if they are fair and it is reasonable to do so. Cambridge Biotech Corporation v. Pasteur Sanofi Diagnostics, 433 Mass. 122, 130 (2000). See also Jacobson v. Mailboxes, Etc. U.S.A., Inc., 419 Mass. 572, 574-75 (1995). The standard set forth by the United States Supreme Court in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 (1972), is utilized to determine the enforceability of forum selection clauses. See Fireman’s Fund Am. Ins. Co. v. Puerto Rican Forwarding Co., Inc., 492 F.2d 1294, 1297 (1st Cir. 1974); Ernest & Norman Hart Brothers, Inc. v. Town Contractors, Inc., 18 Mass.App.Ct. 60, 67 (1984).
Under The Bremen, forum selection clauses are “prima facie valid and should be enforced unless enforcement is shown by the resisting party to be ‘unreasonable’ under the circumstances.” The Bremen, supra, 407 U.S. at 10. A forum selection clause is unreasonable if (1) its incorporation into the contract is the result of fraud or overreaching, (2) its enforcement would violate a strong public policy of the forum in which the suit is brought, or (3) the selected forum is so seriously inconvenient that it deprives a party of its day in court. Id. at 12-18.
There is no showing of fraud or overreaching regarding the forum selection clause, nor would it violate any strong public policy of Massachusetts. Thus, the Court must look to see if the selected forum, England, is so seriously inconvenient that it deprives Longen of its day in court.
Here, the Court is dealing with two very sophisticated parties involved in a truly international business transaction. The plaintiff, Longen, is a Swiss company, based in Geneva. The defendant is an American insurance carrier, based in Boston, that acted throughout the matter in issue through the general manager of its London, England, branch and its designated agent in Belgium. The events took place in Switzerland, Brazil, Malta, Israel, Lebanon, Turkey and on the high seas. Almost nothing happened in Massachusetts.
The courts that are said to be required by the forum selection clause are the English Courts. It would be difficult to find another court system more compatible to those of Massachusetts than the courts of England. Indeed, our very own Supreme Judicial Court — then known as the Superiour Court of Judicature — began its long and illustrious career in 1693, when this country still was a part of England.
The law that is said to apply to this matter is the law of England. The insurance contract in issue is out of the London marine insurance market and replete with interpretation issues that have evolved from that nation’s long history in the maritime insurance business.
To paraphrase from Cambridge Biotech, supra, 433 Mass, at 133:
Here, two sophisticated parties voluntarily agreed in advance that any action arising under the [insurance] agreement would be brought in the [English Courts], Massachusetts law requires us to respect their wishes, and international comity requires us to respect the ability of the [English] courts fairly and competently to settle the parties’ dispute. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629 (1985). The plaintiff [has] not met [its] substantial burden of showing that honoring the forum selection clause would deprive [it] of any meaningful day in court. See The Bremen v. Zapata Off-Shore Co., supra at 19. It is just and reasonable to require the plaintiffl] to bring [its] claims against [Lexington] in the courts of [England].
Longen argues that Lexington, by its own conduct, demonstrates that it did not view the English forum selection clause as part of its contract with Longen. Basically, Longen argues that Lexington has long since waived any rights that it may have had under such a clause. This Court disagrees. Whatever action Lexington may have taken — e.g., bringing suit first in Geneva, Switzerland — cannot be seen as eviscerating the clause that two sophisticated parties agreed upon.
*109 English law, which by agreement controls here, confirms this Court’s decision. For example, in The Makefjell, [1976] 2 Lloyd’s Rep. 29, 34 (cargo dispute arising from shipment of frozen cheesecake from Canada to England subject to forum selection of Norway), the Court of Appeal declared that “[t]he general rule is that the jurisdiction clause must be obeyed. There must be something exceptional to justify departure from it and the exceptional circumstances must be such as to afford strong reasons for such departure.” See also The Star of Luxor, [1981] 1 Lloyd’s Rep. 139, 140.
Given this Court’s conclusions on the forum selection issues, there is no need to plumb the murky depths of the myriad complex issues presented by the saga of the M/V Villa in its ill-fated voyage from Santos, Brazil, in 1997.
ORDER
For the reasons. stated above, the motion of the defendant, Lexington Insurance Company, seeking summary judgment is ALLOWED, and the cross-motion for partial summary judgment by the plaintiff, Longen, S.A. is DENIED. Judgment shall issue dismissing this case.

 See “Plea of Demo Against Zenothemis,” a Special Plea by Demosthenes to a jury in ancient Athens on behalf of his uncle Demo, who had been sued by a certain Zenothemis over a cargo of grain, allegedly purchased in Sicily for transport by sea to Peiraeus. Oration XXXII.