van Gestel, J.
This matter is before the Court after a juiy-waived trial on claims by the plaintiff, Seaboard Surety Company (“Seaboard"), against two of the defendants, LPR, Inc. (“LPR”) and Gerard R. O’Brien (“O’Brien”). The Court’s findings of fact, rulings of law and an order for judgment follow.

FINDINGS OF FACT

This case involves the actions by a surety on certain payment and performance bonds provided for the benefit of the defendant LMAC, LLC (“LMAC”), a Massachusetts limited liability corporation, in relation to work performed principally in Minnesota and Rhode Island, also for bonds issued for projects elsewhere.[2] Much of what is involved in this proceeding relates to a payment bond and a performance bond issued for a project in Minnesota (the “Minnesota bonds”), although a third payment bond for an unrelated matter in Narragansett, Rhode Island (the “Rhode Island bond”) is also in issue.
The project in Minnesota involved a certain “Agreement to Develop and Operate Communications Facilities,” dated December 23, 1997 (the “State Agreement”) and an “Engineering, Procurement and Construction Contract” dated October 13, 1998 (the “EPC Contract”).
LMAC was to design, engineer and construct a fiber optic network throughout Minnesota on behalf of an entity named ICS/UCN (the “Project”). In a manner not clear or material to this case, ICS/UCN and the State of Minnesota were the owners of the fiber optic network.
The Rhode Island matter involved a sanitary sewer system in the town of Narragansett.
All three of the bonds here were issued pursuant to a General Agreement of Indemnity (the “Indemnify Agreement”) running in favor of Seaboard, signed on October 23, 1997, by LMAC as “Contractor” and, among others, the two defendants, O’Brien and LPR, as “Indemnitors.” The Indemnity Agreement was executed by all parties in Boston, Massachusetts.
The first three introductory paragraphs of the Indemnity Agreement read as follows:
WHEREAS, LMAC, L.L.C. of Boston, Massachusetts (hereinafter called Contractor) may from time to time request Seaboard Surety Company . . . (hereinafter called Surely) to execute as surety or guarantor for the Contractor, or procure the execution of, certain surety bonds, undertakings, guaranties, stipulations or other obligatory instruments (all such instruments being collectively called Bonds); and
WHEREAS, the undersigned Indemnitors by executing this instrument represent that they have a material and beneficial interest in the obtaining of such Bonds by the Contractor (the Indemnitors and the Contractor being hereinafter called the Undersigned);
NOW, THEREFORE, in consideration of the execution of any one or more of such Bonds, the Undersigned, for themselves, their respective personal representatives, successors and assigns, jointly and severally, covenant and agree, with respect to all Bonds heretofore or hereafter- executed for the Contractor, that. . .
In the Indemnity Agreement, after the foregoing, there follow 21 separate sections detailing the obligations of indemnification by the Indemnitors, some of which, or parts thereof, will hereafter be quoted where appropriate. Perhaps the most significant of the sections of the Indemnity Agreement is Section 13. It reads in its entirety:
If it becomes necessary or advisable in the judgment of the Surety to control, administer, operate or manage any or all matters connected with the performance of any Bonded Contract for the purpose of attempting to minimize any ultimate loss to the Surety, or for the purpose of discharging its obligations of suretyship, the Undersigned hereby expressly covenant and agree that such action on the part of the Surety shall be entirely within its rights and remedies under the terms of this instrument and as Surety, and do hereby fully release and discharge the Surety, in this connection, from liability for all actions taken by it or for its omissions to act, except for deliberate and willful malfeasance.
On May 1, 2000, Seaboard notified LMAC of a claim on the Rhode Island bond by J.H. Lynch & Sons, Inc. (“Lynch”) in the amount of $137,479.15 for labor and materials. LMAC responded on May 9, 2000, to the effect that there were some items in dispute with regard to the Lynch billings and that the parties were in the process of resolving the issues. Seaboard forwarded Lynch’s proof of claim to LMAC on June 6, 2000, and solicited LMAC’s “written position and [its] intentions regarding this claim at [its] earliest convenience.” A brief response from LMAC was sent to Seaboard on June 12, 2000.
The matter did not get resolved and, by check dated December 6, 2000, Seaboard paid Lynch the amount of $141,054.05. This check appears to have been cashed about a week later.[3]
On June 22, 2000, Seaboard notified LMAC of another claim on the Rhode Island bond, this claim by Inland Waters, Inc. (“Inland”) in the amount of $13,688.20 for labor and materials. Seaboard, as is its practice, asked for information from LMAC regarding this claim. The proof of loss on the Inland claim was sent by Seaboard to LMAC on July 18, 2000, with a *57 further request for LMAC’s position and intentions regarding the claim.
By letter of October 25, 2000, Seaboard further pressed LMAC for information regarding the Inland claim, observing that suit by Inland had by then been filed. By another letter, dated March 6,2001, Seaboard again sought information about the Inland claim and reminded LMAC, LPR and O’Brien of their respective obligations under the Indemnity Agreement.
On March 8, 2001, Seaboard advised LMAC, through its counsel, that it was making a payment of $13,688.20 to Inland on that day. There is some confusion about this letter. It is Exhibit 8E. It bears a date of March 8, 2001, but seems to have been sent by facsimile on March 27, 2001. Seaboard’s check to Inland is dated March 27, 2001, and seems to have been cashed on April 4, 2001.[4] In any event, the letter dated March 8, 2001, after advising LMAC of the payment by Seaboard, asks LMAC to pay Seaboard the amount Seaboard had paid to Inland.
On October 20, 1999, Seaboard first learned of a claim by ICS/UCN against LMAC relating to the Minnesota project, involving the Minnesota bonds. This was shortly after LMAC exercised its claimed rights to stop work on the Project. Among other things, ICS/UCN claimed that it had overpaid LMAC in the amount of $3,596,457.63 on the Minnesota Project. This resulted in litigation in Minnesota brought by LMAC against ICS/UCN. ICS/UCN initiated counterclaims against LMAC.
Also in Minnesota, a company named Northern Pipeline Construction Company (“Northern”) brought suit against Seaboard on the Minnesota bonds, seeking payment of $1,471,844.
By letter dated October 12, 2000, Seaboard notified LMAC, LPR and O’Brien of their obligations under the Indemnity Agreement with regard to the ICS/UCN and Northern claims. In that letter Seaboard also advised that it had engaged the Minnesota law firm of Fabyanske, Westra & Hart (“FW&H”) to defend it in these matters. Attorney Gregory T. Spalj (“Mr. Spalj”) was the principal FW&H lawyer involved.
LMAC engaged Attorney David E. Wandling (“Mr. Wandling”) of the Minnesota law firm of Wandling, Uggen, Rugara, Fowikes, LLC (“WURF”) to represent it in the Minnesota matters.
For a period of time from the first notice of each of the Minnesota claims, Seaboard struggled with, and was frustrated by, the lack of cooperation and response from LMAC in providing information about the Minnesota claims. This problem reached a point where, in this case, Seaboard filed an emergency motion seeking the production by LMAC of documents relating to the Minnesota matters because of an impending September 28, 2001, Minnesota court-ordered deadline. The motion was filed on September 27, 2001; and this Court, by 2:00 p.m. on that same day, issued an Order compelling production by LMAC.
It should be noted that by September of 2001, ICS/UCN had increased the amount sought by its counterclaims to $8 million.
On October 19, 2001, with trial in Minnesota just ten days away, counsel for Seaboard received by facsimile a letter from Mr. Wandling, counsel for LMAC in Minnesota. The first two paragraphs of the letter read as follows:
This confirms our telephone conversation and subsequent voice mail I left with you yesterday afternoon. As I informed you, I provided LMAC with my latest bill for services through October 16, 2001 in the amount of $40,746.67. Mr. O’Brien and John Davey both informed me that LMAC has no funds with which to pay our firm for these past services or any future services relative to representing LMAC at trial. In light of the financial condition of both LMAC and Mr. O’Brien, I have been instructed by Mr. O’Brien to withdraw from representation of both LMAC and him personally. Additionally, in light of the fact I will not be continuing to represent LMAC in this matter, LMAC likely will be left with no choice but to withdraw the affirmative claims it asserted as Plaintiff.
After speaking with you yesterday, I am aware that there may be a possibility Seaboard would agree to pay our firm’s outstanding and future fees and expenses relative to this matter to ensure that LMAC remains an active participant as a Plaintiff. I will refrain from notifying ICS/UCN’s and NPL’s counsel regarding our withdrawal or representation until Monday October 22, 2001 to allow Seaboard an opportunity to determine what, if anything, it wishes to do in this regard. In the event I have not heard from Seaboard by 3:00 p.m. CST on Monday, I will contact Mr. Joyce and Mr. Radio to notify them of our firm’s withdrawal.
Copies of Mr. Wandling’s letter were sent to O’Brien and his Massachusetts attorney, John P. Davey, Esq.
Seaboard chose not to pay Mr. Wandling’s and WURF’s outstanding bill for services rendered to LMAC or to engage him to proceed as counsel in the litigation. Instead, Seaboard proceeded to settle the claims of Northern and ICS/UCN: Northern’s for $875,000; and ICS/UCN’s for $275,000. LMAC was not advised by Seaboard of its action to settle the claims until after the fact. These settlements did not involve LMAC’s affirmative claims in the Minnesota action.
In addition to all of the foregoing, Seaboard paid another Minnesota bond claim in the amount of $71,659.43 to U.S. Filters Distribution Group, Inc.
In all, as of the date of trial of this case, Seaboard has paid $2,119,747.42 in bond claims and losses on behalf of LMAC. It also has accrued $26,742.94 in *58 attorneys fees and costs through January 30, 2003. These two amounts aggregate $2,146,490.36.
Seaboard has recovered from O’Brien the amount of $190,000 in connection with proceeds received from the sale of O’Brien’s Ft. Lauderdale, Florida condominium.
Thus the net aggregate amount being sought by Seaboard in this suit is $1,956,490.36.
Despite the announcement of imminent withdrawal in Mr. Wandling’s October 19, 2001 letter, he did not do so, and LMAC’s claims as a plaintiff against ICS/UCN went to tried before a Minnesota jury near the end of October 2001. By a Special Verdict dated November 7, 2001, the jury in the Minnesota action denied ICS/UCN’s claims and awarded LMAC $2,195,681.38 in damages for unpaid construction, construction management, and engineering fees.
A year before the Minnesota trial, on October 17, 2000, Mr. Spalj’s law firm, acting as counsel to Northern, purported to encumber ICS/UCN’s assets located in Minnesota by filing a UCC-1 Financing Statement under the Minnesota Uniform Commercial Code. LMAC asserts that this filing has inhibited its ability to collect on its judgment against ICS/UCN.
LMAC, and the defendants here, LPR and O’Brien, assert that Mr. Spalj’s action on behalf of Northern securing claims by it against ICS/UCN, while at the same time representing Seaboard in the defense of ICS/UCN’s claims on the Minnesota bonds, amounts to an inappropriate conflict of interest. No action or proceedings of any kind have been brought by LMAC, NPR or O’Brien against Mr. Spalj regarding the alleged ethical violation.
NPR and O’Brien, as indemnitors under the Indemnity Agreement, agreed, among other things, in Section 6, as follows:
They will indemnify the Surety and hold it harmless from and against all liability, losses, costs, damages, attorneys fees, disbursements and expenses of every nature which the Surety may sustain or incur by reason of having executed or procured the execution of any such Bonds; and they will pay over and make good to the Surety all money which the Surety or its representatives shall pay, or cause to be paid or become liable to pay, by reason of its execution of any such Bonds as soon as it shall become liable therefore, whether the Surety shall have paid out such sum or any part thereof, or not. The Surety, in its sole discretion, from time to time may advance funds to or for the account of the Contractor for or in connection with the completion of the work under any contract in connection with which it has executed or may execute a Bond or Bonds . . . and for the discharge of obligations incurred in connection with or relating thereto, and such advances shall be deemed “losses” under the terms of this instrument whether or not such advances have been so used by the Contractor.
Further, LPR and O’Brien agreed, in Section 8, as follows:
The Surety may settle or compromise any claim, demand, suit or judgment upon any Bond or Bonds executed by it, and any such settlement or compromise shall be binding upon the Undersigned . . .
Still further, in Section 14, LPR and O’Brien agreed as follows:
In any action, suit or proceeding brought by the Surety to enforce any of the covenants of this instrument, the costs and expenses, including attorneys fees, incurred by the Surety in connection therewith may be included in any judgment or decree rendered against the Undersigned . . .
Lastly, in Section 9, it is provided that “(t]he vouchers or other evidence of payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Undersigned to the Surety.”

RULINGS OF LAW

Two legal issues are pressed by LPR and O’Brien in their defense of this action. First, they argue that Minnesota law, not that of Massachusetts, should apply. Second, they claim that Mr. Spalj committed ethical violations of such a nature that warrant dismissal of Seaboard’s claims. The Court will address each point in the order presented.
LPR and O’Brien argue that the Minnesota bonds were issued in connection with a Minnesota public project. They further contend that Sec. 20.9 of the agreement for the project includes language to the effect that that agreement, and all disputes relative thereto, are to be determined in accordance with Minnesota law and “without regard to choice of law principles.”
Here, however, the Court is not faced with a claim on either of the Minnesota bonds. Rather, the claims against LPR and O’Brien are brought under the General Agreement of Indemnity, an instrument that provides relief for Seaboard in connection with payments on any bonds it issues on behalf of LMAC in whatever jurisdiction those bonds maybe enforceable. Were this a suit on the bonds themselves, LPR’s and O’Brien’s point would have some merit. See, e.g., Ionics Incorporated v. Liberty Mutual Insurance Company, Suffolk Superior Court, Civil Action No. 02-2400 BLS, 15 Mass. L. Rptr. 508, decided by this Court on December 2, 2002.
The Indemnity Agreement has all of its connections right here in Suffolk County, Massachusetts. It was executed on October 23, 1997, in Boston: on behalf of LMAC by O’Brien as its president; on behalf of LPR by O’Brien as its president; by O’Brien individually; and on behalf of McNicholas U.S., Inc. by Michael B. Hayes as its president. Each of the signatories, on behalf of the corporations they represented, and O’Brien indi *59 vidually, appeared before the same Notary Public, in Suffolk County, on October 29, 1997, and acknowledged their execution of the same.
There is no choice of law provision or forum selection clause in the Indemnity Agreement. See, e.g., Cambridge Biotech Corporation v. Pasteur Sanoji Diagnostics, 433 Mass. 122, 130, 133 (2000).
What is involved in the Indemnity Agreement are contractual obligations to Seaboard in return for its agreeing to execute and provide bonds as a surety in support of construction projects all over the country. The state with the most significant relationship to the transaction involving the Indemnity Agreement and the parties who entered into it is Massachusetts. Further, here the Court is asked to deal with payments and other actions by Seaboard on bonds issued for projects not just in Minnesota, but in Rhode Island as well. See Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 631-632 (1985). Under the circumstances presented, this Court rules that the law of Massachusetts applies.
Next the Court turns to the question of Mr. Spalj’s alleged ethical violations and their effect, if any, on Seaboard’s claims under the Indemnity Agreement.
Ordinarily, the resolution of ethical issues is not within the province of a judge. Rather, the attorneys and clients themselves, with the aid and advice of bar association ethics groups and the Board of Bar Overseers or an equivalent entity, attend to these kinds of issues. “Disciplinary rules provide standards of professional conduct of attorneys and do not in and of themselves create independent causes of action.” Doe v. Nutter, McClennen & Fish, 41 Mass.App.Ct. 137, 141 (1996). See Fishman v. Brooks, 396 Mass. 643, 649 (1986); Bratcher v. Moriarty, Donoghue & Leja, P.C., 54 Mass.App.Ct. 111, 115 n.8 (2002).
Here, we are dealing with alleged violations by a Minnesota attorney of that state’s ethical code. This is hardly the stuff that a Massachusetts judge should wade deeply into. Further, it is not wholly clear that Mr. Spalj’s representation of Northern in its claims against ICS/UCN, while also representing Seaboard in defense of claims by Northern and ICS/UCN on bonds involving the same project, is a violation of the Minnesota Rules of Professional Conduct.
Whether the actions by Mr. Spalj, assuming without determining that they constitute some violation of the Minnesota Rules of Professional Conduct, can be successfully presented as some form of defense or escape hatch from the obligations under the Indemnity Agreement for LPR and O’Brien leads the Court directly to the main legal issue in the case: the effect of the “deliberate and willful malfeasance” exception in Section 13 of the Indemnity Agreement.[5]
The provisions of the Indemnity Agreement reflect “an intention to provide comprehensive protection to [Seaboard] for any loss which it might sustain because of its obligations on surety bonds.” Peerless Casualty Co. v. Marinucci Bros. & Co., Inc., 336 Mass. 691, 695 (1958). “[A]ll liability, losses, costs, damages, attorneys fees, disbursements and expenses of every nature” are included. See American Employers’ Insurance Company v. Horton, 35 Mass.App.Ct. 921 (1993).
Section 13 of the General Agreement of Indemnity is a full release and discharge of Seaboard from liability for all actions taken or omitted by it in connection with any bond issued to LMAC, “except for deliberate and willful malfeasance.” Such broad exculpatory clauses, or releases, are routinely enforced. “Whether such contracts be called releases, covenants not to sue, or indemnification agreements, they represent ‘a practice our courts have long found acceptable.’ ” Sharon v. City of Newton, 437 Mass. 99, 105 (2002).
Deliberate and willful malfeasance is a kind of bad faith that is an affirmative defense that must be specifically pled. Mass.R.Civ.P. Rule 8(c). It does not appear to have been pled by either LPR or O’Brien. Whether pled or not, no deliberate and willful malfeasance on Seaboard’s part has been proven. LPR and O’Brien must show “more than bad judgment, negligence or insufficient zeal.” Hartford Accident and Indemnity Company v. Millis Roofing and Sheet Metal, Inc., 11 Mass.App.Ct. 998, 999 (1981). There must be some “implication of a dishonest purpose, conscious doing of wrong, or breach of duly through motive of self-interest or ill will.” Id. at 999-1000.
After receiving, 10 days before trial, the letter from LMAC’s attorney, Mr. Wandling, announcing that he had been instructed to withdraw from the Minnesota case, it can hardly be said that Seaboard’s settlements of Northern’s $1,471,844 claim for $875,000 and ICS/UCN’s $8,000,000 claim, however much it was inflated, for $275,000, were acts of deliberate and willful malfeasance on Seaboard’s part.[6]
The actions of Mr. Spalj with regard to the Northern U.C.C. filing do not change these facts regarding Seaboard’s actions as surety on the bonds and do not relieve LPR and O’Brien from their obligations of indemnity to Seaboard under the General Agreement of Indemnity.
All of the damages sought by Seaboard have been authorized by the Indemnity Agreement and proven in the way permitted thereby.

ORDER FOR JUDGMENT

Judgment shall enter for Seaboard Surety Company against the defendants LPR, Inc. and Gerard R. O’Brien, jointly and severally, in the amount of $1,956,490.36, with statutory interest and costs from the date thereof.

RULE 54(b) DETERMINATION

The remaining defendant, LMAC, LLC, is in bankruptcy and all proceedings against it before this Court are stayed. Consequently, final judgment shall be entered against LPR, Inc. and Gerard R. O’Brien, there *60 being no just reason for delay. Mass.R.Civ.P. Rule 54(b).

 LMAC is currently in bankruptcy, and all proceedings against it before this Court are stayed.

 The Court says “appears to have been cashed about a week later” because the exhibit is difficult to read as to its date. There is no question, however, of the check having been cashed by the payee.

 Again, the printing on the reverse side of the check is hard to read.

 At this point, the Court observes that only the issues of choice of law and the effect of Mr. Spalj’s actions have been pressed in the defendants’ defense.

 There is absolutely no evidence that the settling of the Lynch and Inland claims in Rhode Island were in any way inappropriate.